54 CCPA

**Application of Warner W. MARTIN and Clifton D. Sweet, Jr.**
**Patent Appeal No. 7736.**

United States Court of Customs and Patent Appeals.
Feb. 16, 1967.

Lawrence B. Biebel, Dayton, Ohio (Charles D. Ross, Dayton, Ohio, of counsel), for appellants.

Joseph Schimmel, Washington, D. C. (Jere W. Sears, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

ALMOND, Judge.

This is an appeal from the decision of the Board of Appeals affirming rejection of claims 20 and 22 through 26 in appellants' application [1] for "Humidi-

1. Serial No. 258,338 filed February 13, 1963.

fiers." Claims 28 through 33 stand allowed. The rejection was predicated on 35 U.S.C. § 103.

Appellants' apparatus is depicted, in material part, in figures 2 and 11 of the application drawings:

FIG-2

FIG-11

The scope of the claimed invention is reflected in representative claim 22 set forth below with each phrase lettered in aid of reference:

(a) A humidifier adapted to increase the amount of water vapor in air using a water supply having various salts and the like in solution,

(b) said humidifier comprising a housing (11),

(c) a reservoir (60) in said housing,

(d) inlet means to said reservoir through which a supply of water can be connected,

(e) means defining an air inlet into said housing and an air outlet (70) from said housing,

(f) evaporator means (55) mounted in said housing between said inlet and said outlet to cause substantially the entire air flow therethrough to pass through said evaporator means,

(g) said evaporator means including a porous nonabsorbent evaporator material formed of a plurality of integrally interconnected relatively thin strands (55a) arranged three dimensionally to form a random arrangement of interconnected pores providing passages through which the air will readily flow and on which strands a portion of the salts will collect and accumulate during evaporation of water therefrom tending gradually to decrease the size of the passages,

(h) said material having a porosity of 8 to 13 pores per lineal inch to maintain an effective flow of air through said evaporator material without entraining droplets of water into the air and to maintain an effective rate of evaporation for a substantially long period of operation even in the presence of accumulated salts on said strands,

(i) said evaporator means also including a mounting (54) for said evaporator material defining a path

of movement thereof which extends through the water in said reservoir,

(j) fan means operatively associated with said housing to induce a flow of air between said inlet and said outlet and through said evaporator material,

(k) and drive means operatively connected to said mounting means for said evaporator material to move said material along said path,

(l) the porosity of said material being coordinated and correlated with the operation of said drive and fan means for maintaining some water present on said evaporator material to accumulate a portion of the salts thereon and the remaining portion of salts in said reservoir thus preventing accumulation on said evaporator material of all of the salts in the water.

Claims 20 and 26 differ from claim 22 in that they do not recite specific porosity. Claim 23 calls for a porosity of 10 pores per lineal inch, while claim 24 calls for the evaporation material to be easily removed to facilitate cleaning and replacement. Claim 25 calls for said material to be "polyurethane open cell foam."

The specification and drawings support the material essence and functions of appellants' invention as set forth in their brief substantially as follows:

An endless strip or belt 55 ("media") is moved along an endless path by motor 51. The belt picks up water from reservoir 60 and carries it to an evaporation zone. Evaporation occurs by passing air from a hot air furnace over and through the media. The composition of the media is preferably as stated in claim 25, the strands of which are surface wetted but do not absorb water. The pores of the media have a random three-dimensional pattern with interconnected strands 55a (Fig. 11) which are wetted on their surfaces as they pass through reservoir 60. The pores or apertures (Fig. 11) are "sufficiently large so that there is little or no tendency for water films to bridge over the pores." As a result of the porosity, composition and surface area of the media, an effective flow of air is

maintained therethrough even after a substantial build-up of minerals thereon. It should be noted here that the principal object of the invention is to solve the problem of coping with the minerals or lime in water supplies, which precipitate on evaporation media causing a build-up of a hard deposit thereon to such an extent that a humidifier gradually decreases in efficiency and finally ceases to function. While not eliminating the minerals, appellants assert that their invention provides a synchronized or coordinated combination of factors which cooperate to accomplish a substantial reduction in the buildup of mineral deposits on the evaporation media and thereby materially reduce the adverse effect of such deposits. It is asserted to be essential that water remain on the strands of the media and that it still be wet when it returns in its revolution to reservoir 60. Hence appellants stress that, in accordance with the invention, there is a *correlation* between the porosity of the evaporation media, the speed of movement of the media through the reservoir, and the rate of air flow.

As a result of such correlation, it is asserted that the mineral problem is controlled in three different ways:

First, as some of the water is evaporated from the strands, the concentration of mineral salts in solution increases due to the decreased volume of water on individual strands. The increased concentration causes some precipitation of minerals on the individual strands. By reason of the three-dimensional arrangement of the strands, which permits the use of a material having relatively large pores, the build-up of minerals on the individual strands has minimum adverse effects, such that the device can usually be used for a period of months or for an entire heating season, without materially affecting air flow or rate of evaporation. As long as the strands remain wet, that is, all the time the humidifier is operating, the mineral build-up thereon is reduced. However, when the cycle stops and the

strands dry off, some precipitation unavoidably occurs.

Second, since the unit is deliberately designed to return the media to the reservoir while the strands are still wet, the concentrated mineral solution is rinsed off to effect removal of a substantial portion of the unprecipitated minerals which would otherwise accumulate on the media. The effect of rinsing the concentrated solution from the strands is to increase the concentration of minerals in the reservoir, with resulting precipitation of the minerals on the side walls and the bottom of the reservoir itself. Obviously this leaves less mineral to deposit on the media.

Third, the rate of air flow and the pore size of the media are so correlated, preferably in the range of 8 to 13 pores per lineal inch, that no mist or droplets are blown out of the media, since this would result in depositing the mineral salts on the walls of the furnace on which they would either build up, or from which they would tend to be blown into the rooms of the house as a fine dust.

The references are:

| Ilg | 1,976,401 | October 9, 1934 |
| French Patent | 1,176,044 | November 17, 1958 |

By stipulation, British Patent No. 858,127 serves as a translation of corresponding French Patent No. 1,176,044. Both patents are owned by Scott Paper Company and will be referred to as Scott.

---

Ilg relates to an apparatus for filtering and cleaning air and regulating the moisture content thereof. The device may be used with either an air cooling or an air heating system. A fan forces air through rotating belts positioned in the air path. The belts are in the form of endless belts of "any suitable fabric material." A finely woven copper or brass mesh fabric is preferred. The belts are rotated slowly by motor and sprocket and chain means. In the process of rotation the belts dip into a reservoir containing water or oil in the bottom of the housing. Ilg states that his apparatus may be employed for filtering purposes alone, humidifying purposes alone, or for both. If employed for filtering purposes, the belt is a closely woven fabric of copper or brass which is essentially two-dimensional. The reservoir contains oil or water and the media is maintained moist. If employed for humidification, "a fabric belt of comparatively coarse mesh may be employed" which is again two-dimensional. The reservoir contains water and "enormous volumes of air" are passed through the belts at "comparatively high velocity" with rapid evaporation ensuing.

Apparently, this would indicate that the belts are not maintained moist, as a result of the high velocity of air flow which would produce rapid evaporation.

As to Ilg's process for combined filtering and humidifying, his disclosure is anything but clear. In the brief of appellants' counsel, the filtering process is designated as Case I, the humidification process as Case II, and the filtering and humidifying process as Case III. Our analysis of the reference supports the view, as to this latter phase, advanced by counsel for appellants, who states:

This situation is a compromise between Cases I and II, and while there is no specific disclosure of the precise material to be used for the belt, the text of the patent would seem to infer that certain features of Case I and Case II should be combined. Thus, to achieve filtering the fabric should be finely woven copper or brass mesh. The liquid in the reservoir should be water in order to carry out the function of humidification, and to carry it out efficiently, enormous amounts of air at a comparatively high velocity

would seem to be required. The patent disclosure does not indicate whether the media should be maintained moist.

Scott's disclosure states that the invention:

* * * relates to novel open-cell, cellulor [sic] structures including integrally formed, 3-dimensionally reticulated and spongiform products, and to the preparation thereof. More particularly the invention relates to foamed polymeric polyurethane materials which have been modified by treatment subsequent to their formation to impart thereto improved physical properties, including softness, hydrophilicity and capillaractive effect toward water, porosity and increased strength.

The patent describes how to produce the material with the pore sizes varying from 0.05 to 20 millimeters. Scott is primarily concerned with a composition of matter and the process of making it. The patent discloses, however, that the material can be used as follows:

* * * depending on the nature and properties of the reticulated products, such as pore size and flexibility, the novel materials * * * are of utility as filtering devices, *gas-liquid contacting devices*, catalyst carriers, rug anchors, door mats, drain pads, scouring pads, sponges, insulating pads, tire liners, spacing devices, flexible partitions, draperies, upholstering padding, mattresses and pillows. [Emphasis supplied.]

The examiner held the claims unpatentable over Ilg in view of Scott. He considered it obvious to replace the material of the belts of Ilg with the polyurethane material of Scott.

At the outset it is pertinent to note that Ilg is not concerned with the problem of lime accumulation on belts when used in the process of humidification. While the board lightly dismissed the correlation feature of the claimed invention, it is manifest to us that appellants teach and specify in their claims that the porosity of the evaporation material, the operation of the drive means which moves this material, and the operation of the fan means which determines the amount of air flowing through the evaporation material should be so correlated that the material reenters the reservoir while it is still wet, so that the amount of moisture-softened lime deposits thereon will be reduced through a washing process as the media passes through the reservoir. We think that the claimed subject matter is specifically directed to this end, which is achieved through the disclosed structural interconnections and designed synchronization of the elements of the claimed combination. The board's statement that "some kind of correlation" exists in Ilg's construction is no answer, in our view, to appellants' combination of elements, which is not shown in Ilg.

As we have hereinabove noted, Ilg's filter-humidifier (Case III) combination specifies a closely woven mesh fabric with a large volume of air passing therethrough, thus producing dry strands with consequent precipitation of pore-clogging mineral deposits thereon, which would stultify the effectiveness of the humidifying function. When Ilg is used solely as a filter (Case I), fine mesh is specified, producing similar results. In Ilg's humidifier (Case II) evaporation is rapid with "enormous volumes of air" passing through the belts at comparatively high velocity. In this aspect of Ilg there is no suggestion as to keeping the belts moist. In fact, Ilg's operation as described would produce a drying of the belt. Air directed thereupon at high velocity would also undoubtedly result in undesirable blowing of droplets into the air stream.

Ilg's teaching relative to keeping the belt moist when his apparatus is used to filter (Case I) is that it will tend to pick up and retain dust on a filter media which is of fine mesh construction. This result would not be accomplished with the use of a coarse mesh as the particles would readily pass therethrough.

Turning to Ilg's humidifier (Case II) in which he recommends a coarse screen, a high velocity of air and "enormous vol-

umes of air" are used to produce rapid evaporation so that the "humidity content of the air can be raised to a maximum." Since filtering is not the object in this phase of Ilg, but rather the use of the high velocity, high air flow to secure rapid evaporation of the water on the strands of the coarse media, it would not be consistent to maintain the coarse mesh humidifier belt wet. The higher the air flow through a given space and the greater the velocity, the more rapidly humidification occurs. While this is consistent with Ilg's teaching, it is, to say the least, remote from appellants' claimed invention.

To support its view that Ilg was aware of impurities in water and the separation thereof from the belt, the board cited the following from the Ilg patent:

> The dirt and other impurities adhering to the screen and released in the liquid medium will settle to the bottom of the well * * *.

We are not persuaded that "dirt and other impurities" are properly susceptible to the construction placed thereon by the board. The board's connotation would have the phrase embrace lime or other mineral deposits precipitated from water in a humidification process. We think it more logical and more supportable from Ilg that "other impurities" refers to air-borne impurities which are filtered from air. As mentioned previously, precipitated lime adheres to the media, unlike dirt and other air-carried impurities, with only a small portion thereof being washed from the media. Appellants' apparatus does not purport to act as a filter but rather as a humidifier attached to a furnace which has a separate air filter for removing dirt. The large pores of appellants' media would preclude its service as an effective filter. The record supports appellants' view that air-carried impurities filtered from the air do not adhere to the media and can thus be easily rinsed therefrom.

The examiner and the board used Scott only for a showing of a three-dimensional material which is similar to that shown in the application on appeal. We must therefore determine whether it would be obvious under 35 U.S.C. § 103 to substitute Scott's material for that of Ilg's belts.

As has been noted, Scott is directed to a new composition of matter, a polyurethane foam with the characteristics of sponge-like materials, capable of hydrophilicity and capillaractivity. These are important liquid absorbing characteristics of a sponge. Appellants' specification states that an important feature of the invention [is] that the sleeve [media] *not* be absorbent since it is not desired to completely saturate the sleeve but only to wet the surface area thereof." (Emphasis ours.) The pores must be open so that droplets of water are not entrained in the air as it is forced through the media.

In their sixteen-page patent Scott catalogs sixteen uses for its material. The examiner and the board rely on one, viz., "gas-liquid contacting devices," to bridge the gap between Ilg and Scott, reaching the conclusion that this phrase in Scott would suggest that this material could be substituted for the substantially two-dimensional material of Ilg to provide the combination defined in appellants' claims. The record discloses dissimilar characteristics for the material of Scott and appellants' media, especially with reference to water absorption and capillary action. Scott discloses a sponge-like material with small pores, while appellants' media is nonabsorbent with large pores. We are not persuaded that one of ordinary skill in this art, without the benefit of appellants' disclosure, would deem it obvious to substitute the Scott material for the media of Ilg.

█ In this connection our attention is directed to the affidavit of Levy. There can be little doubt that Levy's technical training and experience qualifies him as an expert in the pertinent art. He states:

> As a person skilled in this art, he understands this British patent [Scott] as disclosing a material intended to be substantially equivalent to a natural sponge such that when one por-

tion of the material is dipped in water, the remaining portion of the material above the water level becomes wetted due to the capillary action. Since there is no disclosure to the contrary, he concludes from this patent that the urethane foam described therein would not be desirable for an evaporation media of the type used in [appellants' humidifier], since it is difficult to force air through a sponge-like material and any such air flow, due to the small pores required for capillary action and the attendant increase in velocity, would tend to entrain droplets of water in the air with consequent rusting of the associated duct work, and other undesirable effects.

We think this affidavit, directed as it is to the very substance of the issue before us and emanating from an affiant well versed in the subject matter, bears evidentiary weight. Although not conclusive, it is certainly an indication of what the Scott disclosure means to one skilled in the art. In In re Rothermel, 276 F.2d 393, 395, 47 CCPA 866, 870, this court said:

> Where, as here, we are faced with the necessity of determining whether a novel change is obvious, such affidavits can be particularly helpful when they are secured from those actually having skill in the art. It is the practice of this court to consider such affidavits when they supply the facts necessary for consideration in making a proper determination of the issues. The conditions under which such affidavits are to be considered were set forth in In re McKenna [et al.], 203 F.2d 717, 40 CCPA 937. * * *

Appellants' media must be nonabsorbent and highly porous while providing maximum surface areas and air flow therethrough. We are not persuaded that one ordinarily skilled in the humidifier art would learn from Scott that the material disclosed therein could be used in a power operated humidifier of the type disclosed and claimed by appellants. The broad phrase "gas-liquid contacting devices" in the context here presented is not, in our judgment, a sufficient predicate to support the conclusion that the Scott material could be used in the manner claimed by appellants. The expression is generic to numerous devices other than air-water contacting devices, of which latter type humidifiers are only one example. Also, neither Ilg nor Scott affords any teaching anent the lime accumulation problem. We think apposite here the statement of this court in In re Shaffer, 229 F.2d 476, 480, 43 CCPA 758, 762:

> * * * a person having the references before him who was not cognizant of appellant's disclosure would not be informed that the problems solved by appellant ever existed. Therefore, can it be said that these references which never recognized appellant's problem would have suggested its solution? We think not, and therefore feel that the references were improperly combined since there is no suggestion in either of the references that they can be combined to produce appellant's result.

While we do not deem it necessary to launch upon a discussion of the proofs of record, cogent we think, relating to new and unobvious results or a substantial increase in humidifier efficiency or the outstanding commercial success which appellants' invention has achieved, we are persuaded from our review of the record as a whole that the board committed reversible error in holding the appealed claims unpatentable over the cited prior art.

The decision of the board is reversed.

Reversed.

WORLEY, C. J., did not participate.